**TARRANT COUNTY, Appellant,**

**v.**

**DENTON COUNTY, Appellee.**

**No. 2–00–358–CV.**

Court of Appeals of Texas,
Fort Worth.

Aug. 1, 2002.

---

**34.** *See Baker,* 52 S.W.3d at 886.

**35.** *See id.; Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

Cantey & Hanger, L.L.P., S.G., Johndroe, III, C. Matthew Terrell, Scott A. Fredricks, Fort Worth, Texas, Michael D. Moore, Weatherford, Texas, for Appellant.

Thompson, Coe, Cousins & Irons, L.L.P., William N. Radford, Rider Scott, Wade C. Crosnoe, Ross Cunningham, Dallas, Texas, Allison, Bass & Associates, L.L.P., Robert T. "Bob" Bass, Austin, Texas, Whitaker, Chalk, Swindle & Sawyer, L.L.P., John Allen Chalk, Sr., Brent Shellhorse, Fort Worth, Texas, for Appellee.

Panel A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

## OPINION ON REHEARING

TERRY LIVINGSTON, Justice.

We deny Denton County's motion for rehearing. We withdraw our prior opinion and judgment of May 30, 2002 and substitute the following in their place solely to clarify our discussion of one of the conclusions of law.

In 1997 Tarrant County filed suit against Denton County under chapter 72 of the Texas Local Government Code to establish their common boundary line. Denton County counterclaimed seeking a declaratory judgment that the common boundary line had already been established under prior law. The case was tried in Parker County, Texas in 1999 to the bench. The trial court found that the counties' mutual boundary had been established under prior law, as Denton County had claimed. This appeal followed. We reverse.

### Historical Summary

Before statehood, the Republic of Texas was divided into several large land districts. When Texas became a state in the Union in 1845, the Texas Legislature began dividing the land districts into coun-

ties. The three land districts relevant to this dispute are Fannin, Nacogdoches, and Robertson. A copy of an exhibit showing these land districts is attached to this opinion as Appendix 1. The northern boundaries of the Robertson and Nacogdoches Land Districts were common with the southern boundary of the Fannin Land District. Dallas and Denton Counties were created during the first legislative session in 1846.[1] The legislature created Tarrant County in 1849.[2]

The Act creating Dallas and Denton Counties declared that Dallas County was to be created out of the Robertson and Nacogdoches Land Districts and Denton County was to be created out of the Fannin Land District.[3] Dallas County was described as beginning on the southern Fannin boundary line at a point starting three miles east of the eastern boundary of the Peters' Colony Grant and then south thirty miles, then west thirty miles and then north thirty miles to the Fannin line and then to run east on that line back to its northeastern corner beginning point.[4] Denton County, which was to be contained within the Fannin Land District, started at the southwest corner of Collin County, running west for thirty miles, then north

for thirty miles, and then east thirty miles, then south back to the beginning.[5]

When Tarrant County was created on December 20, 1849, it was statutorily described as beginning at Dallas County's southwest corner, then north with the Dallas County line *to the northwest corner of Dallas County*, then due west for thirty miles and then due south thirty miles, then east back to the beginning.[6] From this we can generally conclude that each of the three counties was to contain 900 square miles with Denton County located within the Fannin Land District, Tarrant County within the Robertson Land District, and Dallas County within the Nacogdoches and Robertson Land Districts. A drawing attached as Appendix 2 is representative of the legislative scheme. The statute creating Tarrant County also dictates that Tarrant County's northeast and southeast corners are to bear with Dallas County's northwest and southwest corners if Dallas County's corners were later determined to be incorrect.[7]

On December 1, 1849, the legislature passed an Act Providing for Running and Establishing Correctly, the Line Between

1. Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1332, 1333 (Austin, Gammel Book Co. 1898); Act approved Apr. 11, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 57, 57, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1363, 1363 (Austin, Gammel Book Co. 1898).

2. Act approved Dec. 20, 1849, 3d Leg., R.S., ch. 17, § 1, 1849 Tex.Gen.Laws 14, 14, *reprinted in* 3 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 452, 452 (Austin, Gammel Book Co. 1898).

3. Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1333; Act approved Apr. 11, 1846, 1st

Leg., § 1, 1846 Tex.Gen.Laws 57, 57, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1363.

4. Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1333.

5. Act approved Apr. 11, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 57, 57, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1363.

6. Act approved Dec. 20, 1849, 3d Leg., R.S., ch. 17, § 1, 1849 Tex.Gen.Laws 14, 14, *reprinted in* 3 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 452.

7. *Id.*

Nacogdoches and Fannin Land Districts.[8] This statute directed the Commissioner of the General Land Office (GLO) to appoint a surveyor to run, mark, and *fully establish* the line separating the Nacogdoches and Fannin Land Districts, in accordance with the Act Better Defining the Boundaries of the County of Fannin passed by the Republic of Texas on November 28, 1839.[9]

In accordance with the December 1, 1849 Act, the GLO appointed surveyor William D. Orr to survey the Nacogdoches/Fannin line where they were common.[10] Orr surveyed this line in 1850 and his survey is shown on a map at the GLO. No field notes remain to the Orr map even though there are indications in the GLO files that such notes did exist at some time. According to Tarrant County's witness, Dr. Gary Jeffress, Orr began his survey at the mouth of Bois d'Arc Creek on the Red River to comply with the 1839 statute.[11] He located the southeast corner of the Fannin Land District, which was the starting point for the common boundary between the Nacogdoches and Fannin Land Districts in compliance with the 1839 statute. He went west for sixty miles to the Elm Fork of the Trinity River. The Elm Fork of the Trinity River was the western boundary of the Nacogdoches Land District where it met the Robertson Land District, from which Tarrant County was

created. At the Elm Fork, Orr projected his line as a continuing straight line to the west, marking the southern line of the Fannin Land District. Tarrant County contends this established the Nacogdoches/Fannin line but Denton County claims Orr's line is incorrect because his east-west line drifts northward and because Orr's completed map was not signed or sealed.

A few months after Orr completed his survey for the GLO, Dallas County retained Warren A. Ferris to survey its boundaries, in accordance with the 1846 statute providing for the surveying of county lines.[12] This statute set forth the method for the individual counties to survey and establish their county lines.[13] This Act directed the county court of a county to appoint a surveyor to survey its boundaries if the boundaries were not "sufficiently special and well ascertained." [14] Ferris conducted his survey of Dallas County in July 1850. Tarrant County contends Ferris erroneously surveyed Dallas County because he did not follow the dictates of the statute creating Dallas County. That statute, passed in 1846, defined Dallas County as beginning three miles east of the Peters' Colony grant on the southern Fannin County line, then south thirty miles, then west thirty miles, then north thirty miles to the Fan-

---

8. Act approved Dec. 1, 1849, 3d Leg., R.S., ch. 6, § 1, 1849 Tex.Gen.Laws 5, 6, *reprinted in* 3 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 443, 444 (Austin, Gammel Book Co. 1898).

9. *Id.*

10. The GLO was created in 1846 to administer land records. *See* Act approved May 12, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 232, 232, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1538, 1538–39 (Austin, Gammel Book Co. 1898).

11. Act approved Nov. 28, 1839, 4th Cong., R.S., § 1, 1840 Repub.Tex.Laws 194, 194, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 368, 368 (Austin, Gammel Book Co. 1898).

12. *See* Act approved May 12, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 231, 231, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1537, 1537 (Austin, Gammel Book Co. 1898).

13. *Id.*

14. *Id.*

nin County line, and then east with said line to the beginning.[15]

▮▮▮ Ferris concluded that Orr's survey line was incorrect because his line drifted north of the west line directed by the 1839 Act Better Defining the Boundaries of the County of Fannin. While Denton County admits that Ferris knew Orr's survey line was wrong, it contends Ferris was obligated to honor a line established by a prior survey. Thus, Ferris used Orr's Fannin line to start his resurvey of Dallas County. He identified a "statutory" call on the Orr–Fannin Land District line, proceeded east three miles to the position on the line specified in the Act creating Dallas County, as the point of beginning, and thus set the northeast corner for Dallas County on the Orr–Fannin line. He then ran thirty miles south, thirty miles west and thirty miles north. Ferris's western Dallas County boundary, which goes north for thirty miles, stopped without making an adjoinder with Dallas County's northern boundary, i.e., the southern Fannin Land District line.[16] Instead, he stopped about one-half of a mile south of that line because the 1846 Act Creating Dallas County specified the western boundary should be thirty miles in length. This is where Ferris set Dallas County's northwest corner, instead of making the adjoinder with the Orr–Fannin

line. He then turned east and when he reached the Elm Fork of the Trinity River, the mutual boundary between the Robertson and Nacogdoches Land Districts, he turned north to intersect the end point of Orr's previously surveyed and marked line, approximately one-half mile north of the Elm Fork. This created a jog in Dallas County's boundary with Denton County and left Dallas with a six-sided county. Tarrant County argues this is the critical defect in the Ferris line because the Act Creating Dallas County made the call for adjoinder so that Dallas's western boundary would adjoin the southern Fannin line.[17] Ferris filed his field notes with the GLO.

In 1851 the residents of Denton County petitioned the legislature to pass a statute to better define its borders. They asked the legislature to make Denton County's south line to be on the Dallas County line as run by Ferris instead of Orr because the extension of the Orr line would leave Denton County with less than 900 square miles. In January 1852 the legislature rejected Denton County's request and instead enacted a statute to better define Denton County's boundaries that required Denton County's southwest corner to be at a point due west of Dallas County's northwest corner, *as now established by law*.[18]

---

15. Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1333.

16. A "call for adjoinder" defines a property boundary by reference to a natural or artificial object, i.e., a river or a road, bordering a length of the property's perimeter. *See, e.g., Frost v. Socony Mobil Oil Co.*, 433 S.W.2d 387, 413–14 (Tex.1968) (Smith, J., dissenting); *Kirby Lumber Co. v. Gibbs Bros. & Co.*, 14 S.W.2d 1013, 1014–15 (Tex. Comm'n App. 1929, judgm't adopted). Generally, calls for adjoinder will prevail over calls for distance. *See Watts v. Alco Oil & Gas Corp.*, 540 S.W.2d

557, 563 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.). Where the adjoinder call is ascertainable, it has the same dignity or rank as a call for a natural or artificial object, and any conflicting call for course, distance, or acreage and the like must typically yield. *See id.*

17. Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1333.

18. Act approved Jan. 24, 1852, 4th Leg., R.S., 1852 Tex.Gen.Laws 32, 32, *reprinted in* 3

Specifically, the 1852 statute clarifying Denton County's boundaries required its boundary to start at Collin County's southwest corner, Collin County's southwest corner having already been established. The line was to then run north with Collin County's western boundary to the corner of Grayson County, then west along Grayson's line and then south "to a point due west of the north-west corner of Dallas County, as now established by law," and then east again to the Dallas County northwest corner.[19] Tarrant County contends this statute, which failed to adopt the Ferris line that Denton County's residents proposed, and instead adopted the line "now established by law," compels a conclusion mandating Denton County's southeast corner to be on a line due west of Dallas County's northwest corner, then east to Dallas County's northwest corner. Critical to its position, Tarrant County says the 1852 statute refers to Dallas County's northwest corner *as established by law* as opposed to the corner established by Ferris.

In response, Denton County claims the 1849 statute to run and establish the line between the Nacogdoches and Fannin Land Districts instructed Orr to stop at the western end of the line separating the Nacogdoches and Fannin Land Districts at the Elm Fork of the Trinity River.[20] Denton County argues Orr's survey stopped at this point, which is about five miles east of the current boundary between Dallas and Tarrant Counties. Thus, Denton County claims the southern boundary of the Fannin Land District (and, consequently, the boundary line between the Fannin and Robertson Land Districts) was never surveyed west of the Elm Fork of the Trinity River until Ferris surveyed it. Denton County says the 1852 statute adopts the Ferris northwest corner, which would include a jog at that corner because the statute calls for "eastward" to the point of beginning instead of "east."

In 1852 Denton County appointed George White to survey the unsurveyed portion of Denton County and the Denton/Tarrant line pursuant to the 1852 Act Better Defining the Boundaries of Denton County. (This would be Denton County's southern line west of Dallas County's northwest corner, that is common with Tarrant County.)[21] White used Ferris's field notes from two years earlier. White began his survey at Ferris's northwest corner, moving west first. He surveyed and set mile markers at each mile along the boundary. White returned his field notes to Denton County and they were accepted and later filed with the GLO.

Two years later, Tarrant County appointed A.G. Walker to survey its boundaries, including the unfinished part of its north boundary and in accordance with the 1849 Act Creating the County of Tarrant.[22] Walker located White's twenty-first mile marker for the southwest corner of Denton County.[23] His notes state that the varia-

H.P.N. Gammel, The Laws Of Texas 1822–1897 at 910, 910 (Austin, Gammel Book Co. 1898).

19. *Id.*

20. Act approved Dec. 1, 1849, 3d Leg., R.S., ch. 6, § 1, 1849 Tex.Gen.Laws 5, 6, *reprinted in* 3 H.P.N. Gammel, The Laws Of Texas 1822–1897, at 443, 444 (Austin, Gammel Book Co. 1898).

21. Act approved Jan. 24, 1852, 4th Leg., R.S., 1852 Tex.Gen.Laws 32, 32, *reprinted in* 3

H.P.N. Gammel, The Laws of Texas 1822–1897 at 910.

22. Act approved Dec. 20, 1849, 3d Leg., R.S., ch. 17, § 1, 1849 Tex.Gen.Laws 14, 14, *reprinted in* 3 H.P.N. Gammel, The Laws of Texas 1822–1897, at 452.

23. The parties disputed the effect of Walker's use of White's twenty-first mile marker, but it is clear Walker thought White's line was the same as the Orr line.

tion of his line was the same as Orr's, "which is the same of Dallas County line and the same of the south boundary of Denton County as run by George White." Tarrant County points to this significance as indicating Walker thought White's line was the same as Orr's for the southern Fannin line. Denton County contends this is significant because it shows that Walker recognized White's line. Walker's completed survey and field notes were returned to Tarrant County and then filed in the GLO.

In 1895 the legislature passed an act entitled, "Boundaries as established, adopted and acts creating, continued in force." TEX.REV.CIV.STAT. art. 822 (Boeckmann 1895) (no session law citation available). This act stated: "The county boundaries of the counties in this state as now recognized and established are adopted as the true boundaries of such counties, and the acts creating such counties and defining the boundaries are continued in force." *Id.* Denton County contends this means White's line is the Denton/Tarrant line and Tarrant County contends it means the statutorily defined requirements control and that the northwest Tarrant County corner remained unsettled until the counties resolved their dispute in 1987.

In 1984 the Denton County Commissioners Court requested assistance from Dallas and Tarrant Counties regarding the location of their southern line. That year, Denton and Dallas formed a Bi–County Line Commission for the purpose of determining whether sufficient evidence existed to ascertain on the ground the physical location of their legislatively mandated boundaries. During this process, Denton and Dallas determined it would be necessary to bring in additional counties because their boundaries could be impacted also. So, in 1986 Tarrant, Denton, Dallas,

and Collin Counties entered into an agreement which was an expansion of the previously created Bi–County Line Commission. The expanded agreement states that its purpose is to ascertain and locate on the ground the northern boundaries of Dallas and Tarrant Counties and the southern boundaries of Denton and Collin Counties. A full copy of the Interlocal Cooperation Agreement is attached as Appendix 3 to this opinion. Pursuant to the Interlocal Cooperation Agreement each of the four counties hired and retained Don Jackson of Lichliter–Jameson and Associates to perform the survey and subsequently adopted his survey. However, Denton County denies the validity of the agreement, the survey, and the location of the counties' lines and corners located pursuant to the agreement. Tarrant County contends the Interlocal Cooperation Agreement resolved the four counties' disputes and is binding on Denton County.

### Case and Procedural Background

Tarrant County filed suit to determine its northern boundary line which, in part, is common with Denton County. Tarrant County sued to determine the common boundary between the two counties under section 72.009(a) of the Texas Local Government Code. TEX.LOC.GOV'T CODE ANN. § 72.009(a) (Vernon 1999). Denton County counterclaimed to have the "White Line" declared to be the boundary that was established under prior law according to section 72.009(b) of the local government code. *See id.* § 72.009(b).

Subsection (a) of the local government code, called "Suit to Establish Boundaries," states:

A county may bring suit against an adjacent county to establish the common boundary line. The suit must be brought in the district court of a county in an adjoining judicial district whose

boundaries are not affected by the suit and whose county seat is closest to the county seat of the county that brings the suit. The court shall try the suit in the same manner in which it tries other suits.

*Id.* § 72.009(a). And, subsection (b), that Denton County sued under states:

> The district court has jurisdiction to determine where the boundary line is located and may order the line to be remarked and resurveyed. The line established by the district court shall be treated as the true boundary between the counties *unless the court determines that the line in question was established under prior law.* If the district court determines that the boundary line has been established under prior law, the court shall declare that line to be the true boundary between the counties and shall have that line resurveyed and established as the boundary.

*Id.* § 72.009(b) (emphasis added).[24] Denton County claims their mutual boundary line was previously established under prior law; Tarrant County claims the boundary was never appropriately established.

After an extensive trial to the court, the court entered judgment in favor of Denton County. The trial court found that the line surveyed by White in 1852–53 was established and recognized prior to 1895, that such line was sufficiently definite, and adjudged it to be the true boundary. The court further held that the 1986–87 "Agreement Establishing the Line Common to Dallas, Collin, Denton, and Tarrant Counties," the Interlocal Cooperation Agreement, did not change the boundary between Denton and Tarrant Counties. The trial court also granted Denton County relief under the Declaratory Judgment Act and ordered Tarrant County to pay one-half of the surveying expenses incurred by Denton County through the date of the judgment. The court ordered the resurvey and re-establishment of the boundary line between Denton and Tarrant Counties, as surveyed by White, in accordance with section 72.009(b) of the local government code and further ordered that the future expenses incurred in resurveying and marking the line with appropriate monumentation would be borne by both counties equally. The trial court's judgment also awarded Denton County its attorney's fees in the amount of $1,254,137.80, with conditional awards of appellate attorney's fees. From this judgment, Tarrant County appeals.

### Issues Presented

In eight issues Tarrant County challenges the trial court's judgment. Tarrant County's first issue challenges the propriety of the trial court's rejection of the Interlocal Cooperation Agreement between the two counties. In its second issue it challenges the trial court's refusal to make requested additional findings of fact and conclusions of law relating to the location of the new corner of Dallas County and the northeast corner of Tarrant County. In its third issue Tarrant County challenges the trial court's establishment of a boundary between the two counties based upon a survey it claims is invalid. In its fourth issue Tarrant County claims

---

24. The rest of that section includes the following:

(c) The commissioner of the General Land Office may not mark a contested county line on the maps maintained by the land office until a certified copy of the final judgment is filed in the land office with a certified copy of the field notes of the boundary line established by the judgment.

(d) The remedy provided by this section is in addition to any other remedy prescribed by this chapter.

*Id.* § 72.009(c), (d).

the trial court erroneously placed the burden of proof on the plaintiff in a boundary suit to retrace the boundary line urged by the defendant as part of the plaintiff's case in chief. Closely tied to this issue, Tarrant County also claims in its fifth issue that the trial court improperly excluded rebuttal evidence that it offered to attack Denton County's retracement survey because the court held Tarrant County should have offered such evidence in its case in chief. In Tarrant County's sixth issue it claims trial court error in awarding Denton County its attorney's fees despite Tarrant County's claim of sovereign immunity. In its seventh issue, which is related, Tarrant County claims the trial court erred in awarding surveying costs and attorney's fees to Denton County under the Uniform Declaratory Judgments Act and section 72.006 of the Texas Local Government Code, because the local government code provision upon which both parties base their claims provides for neither attorney's fees nor costs. And finally, in its eighth issue, Tarrant County contends the trial court erred in finding that the boundary line had been validated when there was no or insufficient evidence to show the line had been properly established or recognized at the time the validating act was passed.

### Standard of Review

■ Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

■ If an appellant is attacking the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

■ In reviewing an issue asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames*, 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the issue should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

In accordance with the Texas Supreme Court's instruction, we will detail the evidence relevant to the issue under consideration and clearly state why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g); *see also*

*Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993).

▆▆▆▆ Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the findings. *Reliance Ins. Co. v. Denton Cent. Appraisal Dist.,* 999 S.W.2d 626, 629 (Tex.App.—Fort Worth 1999, no pet.). Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *Forbis v. Trinity Universal Ins. Co.,* 833 S.W.2d 316, 319 (Tex.App.—Fort Worth 1992, writ dism'd). We review conclusions of law de novo to determine whether they are correct. *See Zieba v. Martin,* 928 S.W.2d 782, 786 n. 3 (Tex.App.—Houston [14th Dist.] 1996, no writ) (op. on reh'g). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Waggoner v. Morrow,* 932 S.W.2d 627, 631 (Tex.App.—Houston [14th Dist.] 1996, no writ). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.; Martin–Simon v. Womack,* 68 S.W.3d 793, 796 (Tex.App.—Houston [14th Dist.] 2001, no pet.); *Garner v. Long,* 49 S.W.3d 920, 922 (Tex.App.—Fort Worth 2001, pet. denied).

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show: (1) there was, in fact, error; and (2) the error probably caused rendition of an improper judgment in the case, or probably prevented the appellant from properly presenting the case to the appellate court. Tex.R.App.P. 44.1(a); *In re D.I.B.,* 988 S.W.2d 753, 756 n. 10 (Tex. 1999); *Tex. Dep't of Human Servs. v. White,* 817 S.W.2d 62, 63 (Tex.1991).

## The Interlocal Cooperation Agreement

Appellant's first issue attacks the propriety of the trial court's determination that the counties' 1986 Interlocal Cooperation Agreement had no effect on the location of their common boundary. In this issue, Tarrant County challenges the trial court's findings of fact numbers 3, 26, 49, 57, 58, 59, 65 and 66, as well as its conclusion of law number 11. A copy of the trial court's findings of fact and conclusions of law relative to appellant's first issue are attached to this opinion as Appendix 4. At trial and on appeal, Denton County claims it understood it was agreeing only to a reascertainment of the true historical north boundary line of Dallas County because the counties' contracts for surveying services with Jackson were limited to locating "the existing north line" of Dallas County. Further, Denton County claims that by the time Jackson had located the historical boundary line of Dallas County, he never completed his task. Denton County claims the county line commission was dissolved by the time of Jackson's survey and that his instructions or directions had been changed by some members of the county line commission. Denton County also claims on appeal the counties did not have the authority to enter into the Interlocal Cooperation Agreement. This is the claim upon which the trial court based its ruling.

Tarrant County responds that the Interlocal Cooperation Agreement was a binding and valid agreement, authorized by statute and approved by each of the participating counties. Tarrant County asserts that Denton County's attack on the Interlocal Cooperation Agreement and Denton County's orders authorizing and approving the agreement is an invalid collateral attack on the Denton County court's prior orders approving the agreement and contracts with Jackson.

In order to understand this issue, we first look to the Interlocal Cooperation Agreement. In the opening recital, the four counties acknowledge that the original Bi–County Line Commission was formed between Denton and Dallas Counties to see if there was sufficient evidence to ascertain their common boundary pursuant to the statutes creating both counties. The parties agreed that the purpose of the agreement was to determine if sufficient evidence existed for ascertaining the physical location of the line on the ground. All parties recited that each county had received the appropriate authorization from their respective counties to enter into the agreement and that the agreement was being created under the authority of article 4413(32c) of the Texas Revised Civil Statutes.[25] The agreement created a "Project Committee" comprised of representatives from each of the four counties who were charged with the responsibility of overseeing the surveying efforts.

Next, we look to the orders each county entered. Each county approved appointing Jackson to perform the survey and each county entered into a contract with the surveying firm. Denton County's order approving the Interlocal Cooperation Agreement states the surveyor was to "ascertain by actual survey the southern boundary of Denton County, Texas where it is common with the southern [sic, should be northern] boundary of Dallas County, Texas, and to mark and establish said line and the southeastern corner of Denton County, Texas." The Denton County Commissioners Court order is entitled "Order Providing for the Ascertainment of County Line" and states in relevant part that:

[T]here have been questions regarding the precise location of the boundary line marking the northern boundary of Dallas County where it is common with the southern boundary of Collin County, the southern boundary of Denton County and the point where it is common with the northeastern corner of Tarrant County.

The commissioners court order further states that "it appears that said line is not sufficiently definite and well-defined" but that the line could be ascertained and that it is Denton County's desire to ascertain the location of the boundary line and to mark the same on the ground as provided by article 1582 of the civil statutes. *See* TEX.REV.CIV.STAT.ANN. art. 1582 (Vernon 1962) (current version at TEX.LOC. GOV'T CODE ANN. § 72.001 (Vernon 1999)).

Additionally, each county then entered into a separate contract with Jackson's surveying firm. Denton County's agreement described the surveyor's services to include the ascertainment of:

(1) the existing north line of Dallas County, Texas where it is common with the south line of Denton and Collin County, and the northeast corner of Tarrant County[;] (2) the southerly line of Denton County where it is common with the northern boundary line of Dallas County[;] (3) the southern boundary line of Collin County, Texas where it is common with the north line of Dallas County[;] (4) the Denton–Tarrant County line at the northeast corner of Tarrant County through field surveys and office research based upon the legal records dating back as far as reasonable surveying practices dictates the necessity to research.

25. Interlocal Cooperation Act, 62d Leg., R.S., ch. 513, 1971 Tex.Gen.Laws 1751 (recodified at TEX.GOV'T CODE ANN. §§ 741.001–.012 (Vernon 1994)), *repealed by* Act of May 27, 1995, 74th Leg., R.S., ch. 876, § 12.02, 1995 Tex. Gen.Laws 4357, 4360.

The contract for services also required the surveyor to locate and tie the northeast Tarrant County corner to the nearest United States geodetic survey monument and to locate and tie the "originally platted survey corners as referenced in the original boundaries lines of Dallas County at the northwest corner of Dallas County." Additionally, the Denton County contract directed Jackson to calculate "the northeast and northwest corners of Dallas County and their location in reference to Denton, Collin County, and the northeast corner of Tarrant County." Denton County's contract also directed the surveyor to calculate the "southwest corner of Collin County and southeast corner of Denton County on the Dallas County line with a monument on the ground."

Pursuant to the Interlocal Cooperation Agreement, Jackson prepared a survey and field notes locating the boundaries and corners covered by the agreements and contracts. In May 1987 Denton County and the other three counties approved Jackson's field notes by county court orders. Jackson determined that Ferris, and therefore White, had erroneously located Dallas County's northwest corner 2200 feet south and 1300 feet east of where it should have been, resulting in the jog in Dallas County's northwest corner and creating two northwest corners for Dallas County. Therefore, Jackson set Dallas County's northwest corner and Tarrant County's northeast corner at the same point and monumented that location per the Interlocal Cooperation Agreement. This gave Dallas and Tarrant counties a common corner on the Fannin line.

However, the trial court concluded that the Interlocal Cooperation Agreement did not affect the boundary separating Denton and Tarrant Counties because the boundary had been established under prior law and was ascertainable at the time of the 1986 agreement. In its conclusion of law number 7, the trial court relied upon the common law principles set forth in *Jones v. Powers*, 65 Tex. 207 (1885), that precluded the movement of the boundary line either by a court of law or by agreement between counties when the line had already been established under prior law and could be ascertained. In other words, the trial court held that the counties had no authority to enter into an agreement to determine their common boundaries and corners because the statute authorizing such agreements could not apply where the lines had already been established under law.

In *Jones v. Powers*, a trespass to try title claim between individual land owners, one of the parties claimed that the deed was insufficient to convey title to the property because the land was situated in Kaufman County but the deed was recorded in Rockwall County. Naturally, the parties disputed in which county the property was located. The supreme court remanded the case for further development of the facts regarding the disputed boundary lines but articulated the principles applicable to these types of disputes and their resolution. The key factor, according to the court, is whether the line between the two counties had ever been legally established upon the ground. *Id.* at 212. The court held:

> [I]f the lines have once been definitely fixed upon the ground by an actual survey made, reported and approved, as required by the statute, that a county court has no power to direct another survey to be made and thereby establish a boundary line different from the one established at some former period. It is only when it may appear to the county commissioners court, or to the commissioner of the general land office, that the boundary, or a part of the boundary of a

county "is not sufficiently definite and well defined" that action to make it definite is authorized.

When a county line has been once run, marked upon the ground and established in accordance with law, it cannot be said to be indefinite. It may be incorrect, but nevertheless well defined. None of the statutes seem intended to give power from time to time to county commissioner's courts to correct what may have been incorrect in the establishment of a county line on the ground....

*Id.* at 213. Denton County contends because the line was already established the Interlocal Cooperation Agreement is unenforceable. In response, Tarrant County contends the statute in effect at the time the parties entered into the Interlocal Cooperation Agreement controls. That statute provides:

Whenever it appears to the satisfaction of the county court of any county ... that the boundary or any part thereof, of the county is not sufficiently definite and well defined, such court shall appoint an experienced and competent practical surveyor, whose duty it shall be to ascertain by actual survey the boundary, or any part thereof, of said county, and to make and establish the lines and corners in the manner herein prescribed. The court, in the order making the appointment, shall specify the line or lines to be run and the corners to be established and marked; and shall in all things conform to the law defining the boundaries of said county.

Tex.Rev.Civ.Stat.Ann. art. 1582. Tarrant County claims the statute authorized the counties' 1986 agreement and the trial court erred in ignoring the parties' agreement in light of this statutory authority, as interpreted by *Yoakum County v. Gaines County,* 139 Tex. 442, 163 S.W.2d 393, 396–97 (1942). We agree.

In *Yoakum County v. Gaines County,* Gaines sued Yoakum and Terry Counties in an effort to set aside a boundary line that the three counties had agreed upon under a three-way settlement agreement they had entered into to survey and mark the line in order to permanently establish the line. *Id.* at 395. Each county entered an order reciting, in pertinent part:

[I]t appears to the Court that said boundary line has never been defined, surveyed, marked and due returns thereof made in accordance with law, and that the ... Commissioner's Court of [each] county having met jointly ... and mutually agreed that the said line should be surveyed, marked and due returns made permanently establishing said line by agreement....

*Id.* Each county signed a similar order approving the agreement and subsequently examined and approved the surveyor's report, field notes, and maps which were then filed in and approved by the GLO. *Id.* The supreme court noted that the record supported allegations of a bona fide dispute between the three counties as to where the line was and that there was no allegation or proof that any of the three commissioners courts had not acted in good faith in entering into the settlement agreement. *Id.* at 396. Further, the court observed that no attack had been made on the orders or judgments since the orders were signed in 1935, which was five years prior, so that the attack was an impermissible collateral attack. *Id.* The only potentially viable issue was whether the three commissioners courts had the power and authority to act. The court noted that only where the "boundary line of a county has been established and definitely marked, and is known and recognized, then such line must be accepted." *Yoakum,* 163 S.W.2d at 396 (citing *Jones,* 65 Tex. at 213). The court continued by

observing that where a boundary line is not sufficiently definite and well defined and established, articles 1582–1592 provide the appropriate method for determining the boundary. *Id.* The supreme court concluded the agreement between the three counties was valid and stated:

> Since counties have the power to ligitate [sic] their boundary controversies, we think that when acting in good faith, they have the power to settle their bona fide boundary disputes out of court, so long as they do not violate any provision of the Constitution.

*Id.* at 397.

The court made several observations in reaching its conclusion which differentiated the facts in *Yoakum* from the facts in *Jones.* First, none of the counties in *Yoakum* denied entering into the settlement agreement nor entering each of their respective orders or judgments adopting same. *Id.* at 396. Additionally, the evidence showed the Harris line promoted by Gaines County had not been marked and identified as required by statute although it had been filed in and accepted by the GLO. *Id.* at 394. Alternatively, Gaines County pled for two other lines to be declared to be the true boundary. The court concluded that the boundary was indefinite and that the counties had entered into the settlement agreement in a good faith attempt to settle the only issue of fact in the case—the location of the boundary. *Id.* at 397. The *Yoakum* opinion closes with a quote from the *Lynn County* case that states, "The rule is well settled that counties may settle their boundary disputes, and, where the line is established 'in accordance with the law,' their acts will be approved. In fact, it is the public policy of this state to look with favor upon peaceable boundary agreements between interested counties." *Id.* at 398 (quoting *Lynn County v. Garza County,* 58 S.W.2d 24, 26 (Tex.Comm'n App.1931, judgm't adopted)); *cf. Cochran County v. Hockley County,* 158 S.W.2d 102, 106 (Tex.Civ.App.—Amarillo 1941, no writ) (holding because line had been marked, identified, known, recognized, and acquiesced in, counties could not agree to relocate it).

This case is controlled by *Yoakum.* The recitals in the Interlocal Cooperation Agreement and Denton County's order approving the agreement, coupled with Denton County's contract with the surveyor, all recite that a bona fide dispute existed between the four counties as to their common borders and corners. Denton County has never alleged fraud nor shown a lack of good faith on the part of any of the counties in entering into the Interlocal Cooperation Agreement. The boundaries and corners were surveyed by Jackson in accordance with the Interlocal Cooperation Agreement and his survey and revised field notes were accepted and adopted by yet another order of the Denton County Commissioners Court. His revised field notes and survey were also filed with and accepted by the GLO.

The record also shows that Denton County specifically approved Jackson's survey and forwarded it to the GLO. The cover letter from the Denton County judge states:

> On the 2nd of February, 1987, Denton County Commissioners Court approved the reestablishment of the Dallas/Denton County Line in southern Denton County due to an error in surveying in the 1850's.
>
> We would like formal approval and acceptance by your office . . . .

The Denton County Commissioners Court's minute orders reflect the court's acceptance of Jackson's revised field notes on the Dallas County and Denton County line.

 Further, as in *Yoakum*, Tarrant County argues that it is impermissible for Denton County to now attack its own orders because such attacks would amount to impermissible collateral attacks on its own judgments. *See Yoakum*, 163 S.W.2d at 396. It is undisputed that Denton County never filed any kind of direct appeal or other action challenging any of the commissioners court orders. Denton County never denied entering into the Interlocal Cooperation Agreement and never, attacked its 1986 order approving the Interlocal Cooperation Agreement or its multitude of orders approving Jackson's work and his revised field notes by direct appeal or upon completion of Jackson's work. Our supreme court has previously held that "the judgments of commissioners' courts in all matters over which they are given jurisdiction by the Constitution and statutes are entitled to the same consideration as those of other courts provided for by the Constitution." *Tarrant County v. Shannon*, 129 Tex. 264, 104 S.W.2d 4, 9 (1937). A collateral attack on a former judgment is successful only where the former judgment is void. *Pursley v. Ussery*, 937 S.W.2d 566, 568 (Tex.App.—San Antonio 1996, no writ).

At trial, Denton County raised no objection to the admissibility of its county's orders or minutes approving the Interlocal Cooperation Agreement, the professional services agreement, or Jackson's survey and field notes. Thus, the trial court's review of the orders and Interlocal Cooperation Agreement should have been limited to a review of the validity of those acts only. *See Yoakum*, 163 S.W.2d at 396.

Denton County argues that its position that its common boundary with Tarrant County was established under prior law is not an impermissible collateral attack on the 1986 Interlocal Cooperation Agreement because that agreement was limited to the narrow purpose of reascertaining the northern boundary of Dallas County and, at most, had the effect of locating the southeastern corner of Denton County, not the historic border between Denton County and Tarrant County. We reject Denton County's effort to sidestep the Interlocal Cooperation Agreement by restricting its scope and binding effect in this manner.

As Tarrant County points out, in 1986 Denton County was intent upon properly locating its southern boundary and the point where it is common with the northeastern corner of Tarrant County, as reflected by the explicit finding of Denton County's own county commissioners court in 1986 that "there have been questions regarding the precise location of" its southern boundary and that "it appears that said line is not sufficiently definite and well defined." Moreover, the Interlocal Cooperation Agreement established the northwest corner of Dallas County, which is also the point from which the boundary between Tarrant County and Denton County necessarily commences according to the statutes creating both counties.[26] Thus, viewed in context, Denton County's position as adopted by the trial court, that its southern boundary with Tarrant County was established under prior law, is clearly an attempt to impermissibly collaterally attack the 1986 Interlocal Cooperation Agreement, and specifically the orders approving it and the surveys made and filed under the agreement.

 Denton County nevertheless also challenged the constitutionality of the In-

---

**26.** Act approved Mar. 30, 1846, 1st Leg., § 1, 1846 Tex.Gen.Laws 14, 14, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1333; Act approved Dec. 20, 1849, 3d Leg., R.S., ch. 17, § 1, 1849 Tex.Gen.Laws 14, 14, *reprinted in* 3 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 452.

terlocal Cooperation Agreement by asserting that following it would result in a violation of article IX, section 1 of the Texas Constitution because it would result in removal of a part of one county to another without the vote and approval of the electors in both counties. TEX. CONST. art. IX, § 1. This issue has also been resolved against Denton County in the *Yoakum* case. The supreme court upheld the authority and power of counties to enter into settlements of good faith boundary disputes in the face of a constitutional attack. *Yoakum*, 163 S.W.2d at 397. In response to the plaintiff's assertion of the infirmity of the counties' settlement the supreme court held, "We see nothing in Article 9, Section 1, Subsection 3, of the Constitution, which prohibits the settlement of a bona fide boundary dispute between counties." *Id.* It follows that counties should have the power to settle their bona fide disputes in light of the legislative grant of authority to litigate their disputes. *Id.* The court interpreted that portion of the constitution to only prevent counties from detaching a part of one county where the boundary lines are definite and well defined, and attaching same to another county. *Id.* The court concluded the agreements did not violate the constitution and we believe the same conclusion is dictated here. Denton and Tarrant Counties settled in good faith a bona fide boundary dispute by entering into the Interlocal Cooperation Agreement, which was ratified and confirmed by two subsequent county court orders. At the time of the agreement, the boundary was not, by Denton County's admission, "definite and well-defined." Thus, Denton County has not shown that the commissioners courts were acting without authority in entering into the Interlocal Cooperation Agreement or the orders authorizing and effectuating that agreement. Therefore, under *Yoa-kum,* the agreement did not violate the constitution. *See id.*

We, therefore, answer Tarrant County's first issue affirmatively by concluding that the trial court erred in failing to enforce the valid, binding, and good faith effort by the counties to resolve their boundary disputes in the Interlocal Cooperation Agreement. The 1986 Interlocal Cooperation Agreement entered into and approved by both Tarrant and Denton Counties is a valid and constitutional agreement binding on both parties.

Therefore, we conclude and hold the line located by Jackson that was approved by both counties is the true boundary between these counties. We sustain Tarrant County's first issue and conclude the trial court erred as a matter of law in its conclusion of law number 11.

In conclusion of law number 7, the trial court held, "The common law principles established in *Jones v. Powers*, 65 Tex. 207 (1885), preclude any movement of the Denton/Tarrant boundary line by a Court of law or by agreement between the counties because it was established under prior law and can be re-ascertained." In conclusion of law number 11, the court held that neither the Interlocal Cooperation Agreement, the professional services contract, nor the Jackson survey affected the boundary because it had been established under prior law and was ascertainable. Because we have concluded the court erred in its conclusion of law 11, conclusion of law 7 cannot stand. The issues and arguments presented by Tarrant County and Denton County directly focus on the validity and authority of the two counties to enter into the Interlocal Cooperation Agreement, which is at the heart of both conclusions of law 7 and 11. Because we are to consider the parties' arguments and to treat each issue as covering each subsidiary issue that is fairly included within an

issue, conclusion of law 7 must fail or succeed with conclusion of law 11 even though Tarrant County did not specifically list conclusion of law number 7 in its challenged conclusions. *See* TEX.R.APP.P. 38.1(e); *Silverthorne v. Mosley*, 929 S.W.2d 680, 683 (Tex.App.—Austin 1996, writ denied) (citing *Anderson v. Gilbert*, 897 S.W.2d 783, 784 (Tex.1995)). Because of our conclusion regarding conclusion of law number 11, conclusion of law number 7 necessarily fails, too.

Because we have determined these conclusions are incorrect as a matter of law and they cannot be sustained under any legal theory supported by the evidence, we must next determine whether these errors were reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP.P. 44.1(a)(1). We conclude they did because the validity and viability of the Interlocal Cooperation Agreement and the counties' orders approving it, were key to Tarrant County's case; if the agreement, along with the Denton County order adopting it, is valid and binding, then all that was required of the trial court was to properly document the boundary, establish it, remark it, and resurvey it based upon the Jackson survey that the counties had already approved and filed with the GLO.

## ATTORNEY'S FEES AND SURVEYOR'S COSTS

In issue six Tarrant County asserts that the trial court erred by refusing to recognize Tarrant County's sovereign immunity when it awarded attorney's fees and surveying costs. In issue seven Tarrant County claims that the attorney's fees and surveying costs awards are not authorized by statute.

*Attorney's Fees*

In their pleadings, Tarrant County and Denton County both characterized this lawsuit as a boundary dispute and a declaratory judgment action. Both sought recovery of their attorney's fees under the Uniform Declaratory Judgments Act. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). Six weeks after trial, but before the final judgment was signed, Tarrant County attempted to assert that sovereign immunity barred the recovery of attorney's fees in this boundary dispute and nonsuited its Declaratory Judgments Act claims.[27] In its findings of fact and conclusions of law, the trial court concluded that Tarrant County waived its sovereign immunity defense, that Denton County was entitled to recovery of attorney's fees under the Declaratory Judgments Act, and that Denton County's recovery of attorney's fees was not barred by sovereign immunity. In its final judgment, the trial court awarded Denton County over one million dollars in attorney's fees.

Sovereign immunity, unless waived, protects the State from lawsuits for damages. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex.1997). There are two distinct types of sovereign immunity: immunity from suit and immunity from liability. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999); *Fed. Sign*, 951 S.W.2d at 405. Sovereign immunity from suit bars lawsuits against units of state government unless express consent has been given. *Jones*, 8 S.W.3d at 638; *Fed. Sign*, 951 S.W.2d at 405. Absent consent, the trial court does not have jurisdiction to hear the claim. *Jones*, 8 S.W.3d at 638–39. Immunity from liability protects the State from judgment even if the legislature has

---

**27.** Denton County claims that the trial court informed the parties of its ruling in a November 3, 1999 letter. The letter is not included in the appellate record; therefore, it will not be considered in this appeal.

expressly consented to the suit. *Id.* at 638; *Fed. Sign,* 951 S.W.2d at 405. Like other affirmative defenses to liability, immunity from liability must be pled or else it is waived. *Jones,* 8 S.W.3d at 638. Immunity from liability does not affect the court's jurisdiction to hear a case. *Id.* Legislative consent to sue the State must be expressed in "clear and unambiguous language." *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 594 (Tex.2001).

■ The legislature expressly consented to a lawsuit by one county against another to establish the common boundary line between them. TEX.LOC. GOV'T CODE ANN. § 72.009(a).[28] The statute waiving governmental immunity in such lawsuits is silent about attorney's fees, however. *See id.* Thus, we must determine whether the scope of the legislature's waiver of sovereign immunity includes a claim for the recovery of attorney's fees.

Tarrant County construes the legislative consent narrowly, claiming that it is limited to a determination of the location of the boundary line. Thus, Tarrant County argues that immunity from suit bars the attorney's fees claims. It also asserts that it could challenge the trial court's jurisdiction at any time. Conversely, Denton County construes the legislative consent broadly, arguing that the waiver of immunity in boundary dispute litigation between counties extends to claims for attorney's fees. Alternatively, it argues that the only type of immunity that might attach to the attorney's fees claims is immunity from liability, which Tarrant County waived by not asserting the affirmative defense timely or by its conduct in also seeking the recovery of attorney's fees.

The Texas Supreme Court has addressed the issue of whether attorney's fees are recoverable in similar boundary disputes involving governmental entities.[29] *Brainard v. State,* 12 S.W.3d 6 (Tex.1999). In both cases, the supreme court concluded that attorney's fees were not recoverable. *Kenedy,* 44 Tex.Sup.Ct.J. at 289, 2000 WL 1862934, at *16; *Brainard,* 12 S.W.3d at 29.

In *Brainard,* landowners sued the State to determine the location of the boundary between the State's riverbed and the landowner's riparian tracts. *Brainard,* 12 S.W.3d at 10. The lawsuit was authorized by a senate resolution that expressly prohibited the landowners from recovering damages or attorney's fees. Senate Concurrent Resolution 165, 71st Leg., R.S.,

**28.** "A county may bring suit against an adjacent county to establish the common boundary line." TEX.LOC. GOV'T CODE ANN. § 72.009(a).

**29.** *See John G. & Maria Stella Kenedy Mem'l Found. v. Dewhurst,* 44 Tex.Sup.Ct.J. 268, 2000 WL 1862934 (Dec. 21, 2000) (rehearing granted). We recognize that the *Kenedy* opinion is not final and, therefore, is not a part of the jurisprudence of this state. *See Yeager v. State,* 727 S.W.2d 280, 281 n. 1 (Tex.Crim. App.1987). *Kenedy* provides the supreme court's most recent determination of a similar issue, however, and we find the supreme court's analysis instructive. In *Kenedy,* landowners sued the State to determine the location of a seashore boundary under ancient land grants. *Kenedy,* 44 Tex.Sup.Ct.J. at 269, 2000 WL 1862934, at *1. The lawsuit was authorized by section 37.171 of the Texas Natural Resources Code, which did not mention attorney's fees. TEX.NAT.RES.CODE ANN. § 33.171 (Vernon 2001). The supreme court concluded that the statute's silence concerning attorney's fees could not be construed as a waiver of governmental immunity from liability for such awards. *Kenedy,* 44 Tex.Sup.Ct.J. at 289, 2000 WL 1862934, at *16. The supreme court also determined that the landowners were not entitled to attorney's fees under the Declaratory Judgment Act because their pleadings did not assert any of the types of claims authorized by the Act. *Id.*

1989 Tex.Gen.Laws 5909;[30] *Brainard*, 12 S.W.3d at 10. The supreme court determined that there was no language in the resolution indicating that the legislature intended to authorize the landowners to bring a claim under the Declaratory Judgments Act that could ultimately result in an attorney's fees award. *Brainard*, 12 S.W.3d at 29. It observed that the resolution authorized declaratory relief in the form of a determination and establishment of the boundary line, but not the recovery of attorney's fees. *Id.* Therefore, the supreme court interpreted the resolution as limiting the suit to a judicial determination of the boundary and held that the legislature did not waive the State's sovereign immunity from suit with respect to a claim for attorney's fees. *Id.* at 28. According to the supreme court, the prohibition against an award of damages or attorney's fees was an additional condition to which the consent to sue was made subject. *Id.*

In this case, the local government code authorizes the recovery of certain types of damages related to county boundary disputes, but is silent concerning attorney's fees. Tex.Loc. Gov't Code Ann. § 72.006 (providing for payment of surveying expenses); *compare* Tex.Nat.Res.Code Ann. §§ 33.171–.176 (providing for neither damages nor attorney's fees). "[T]he well-established rule [is] that an award of attorney's fees may not be supplied by implication but must be provided for by the express terms of the statute in question." *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex.1999). Because the legislature expressly consented to suit for certain types of damages but not others, we cannot conclude, as Denton County urges, that it intended a blanket waiver of immunity from suit and liability for all damages. To the contrary, the statute limits the suit to a judicial determination of the common boundary and authorizes the recovery of surveying expenses to establish that boundary, but otherwise retains governmental immunity from suit for attorney's fees.

■ Denton County also argues that the Declaratory Judgments Act waives governmental immunity from suit for attorney's fees. *See Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex.1994) (holding attorney's fees waived in lawsuit brought under Declaratory Judgments Act to interpret statute). Tarrant County counters by asserting that this is not a Declaratory Judgments Act case because Denton County's counterclaim did not raise a claim under the Declaratory Judgments Act. Instead, Tarrant County claims Denton County is simply using the Declaratory Judgments Act to bootstrap its attorney's fees claim onto the boundary determination authorized by section 72.009.

The Declaratory Judgments Act authorizes declaratory relief against the State only in specifically described types of actions: questions of "construction or validity arising under [an] instrument, statute, ordinance, contract, or franchise." Tex. Civ.Prac. & Rem.Code Ann. § 37.004(a) (Vernon 1997). Denton County did not plead any of these. In response, Denton County relies on Tarrant County's live pleading at trial, which sought a determination of the common boundary "based upon a review of the statutes referred to [in the petition, e.g., section 72.009], as well as other documentation and evidence," to support Denton County's claim for attorney's fees under the Act. *Id.* § 37.009

---

**30.** "Any final judgment adjudicating the title dispute in a suit brought concerning title to boundaries of the Canadian River under this resolution shall be limited to settling the title dispute and may not authorize an award of monetary damages or attorney's fees." Senate Concurrent Resolution 165, 71st Leg., R.S., 1989 Tex.Gen.Laws 5909.

(authorizing recovery of "reasonable and necessary attorney's fees as are equitable and just"). We agree that the pleadings do not raise a claim under the Declaratory Judgments Act. Neither party's pleadings assert that this case is one to construe a statute or contract; instead, both parties are simply asking the court to establish the common boundary line as authorized by section 72.009. Nothing in section 72.009 indicates the legislature intended to authorize counties to resolve boundary disputes under the Declaratory Judgments Act, and section 72.009 grants the trial court all of the authority it needs to establish the boundary without resort to the Declaratory Judgments Act. *See* Tex.Loc. Gov't Code Ann. §§ 72.001–.009. Attorney's fees are the only relief sought under the Declaratory Judgments Act that is not expressly authorized by section 72.009.

We hold that the trial court erred in awarding attorney's fees because Tarrant County enjoys immunity from suit on the attorney's fees claim.

### Surveyor's Costs

█ Tarrant County and Denton County both included a general request for costs in the prayer section of their pleadings. In the final judgment, the trial court ordered Tarrant County to pay more than $225,000 to compensate Denton County for one-half of the surveying fees Denton County incurred during the litigation. The costs could not be recovered under the Declaratory Judgments Act because we have determined that the Act does not apply in this case. Therefore, we must determine whether the costs were properly awarded under the local government code.

Section 72.009 authorizes the district court to determine where the boundary line is located and to order the line to be remarked and resurveyed. This remedy is in addition to any other remedies authorized in chapter 72. Tex.Loc. Gov't Code Ann. § 72.009(d). Section 72.001 authorizes the county court, not the district court, to appoint a surveyor to survey an indefinite county boundary, and section 72.006 provides that "[t]he counties that have an interest in the boundary lines in question shall divide the expenses incurred in making the survey and establishing the boundary markers in proportion to each county's frontage on the line."[31] *Id.* §§ 72.001(a), 72.006(a).

Tarrant County argues that section 72.009(b) contemplates future action and that, in reality, the surveyor's costs award is an award of expert fees, which is not authorized by the statute. We agree that section 72.009(b) contemplates prospective action only, and does not authorize an award of litigation expenses previously incurred by the parties. Therefore, we hold that the trial court erred by awarding one-half of Denton County's prelitigation and litigation surveying costs as damages. Only those expenses incurred under the trial court's authority and direction under section 72.009(b) should be borne by both parties.

We sustain issues six and seven.

### Conclusion

Because we have sustained Tarrant County's first issue, we reverse the trial court's judgment in favor of Denton County and render judgment in favor of Tarrant County based upon the validity of the Interlocal Cooperation Agreement and the counties' orders approving the agreement and the surveys made as a result of the

---

**31.** Tarrant County does not challenge the district court's appointment of a surveyor, so we will not address the propriety of the surveyor's appointment by the district court instead of by the county court.

agreement. We sustain Tarrant County's issues six and seven regarding attorney's fees and surveying expenses and render judgment in its favor. We remand the case to the trial court for entry of a judgment properly adopting the Jackson survey and for entry of any other orders the trial court deems appropriate related to or necessary to any resurveying and remarking of the boundary.

CAYCE, C.J., filed a concurring opinion.

## APPENDIX 1

# APPENDIX 2

## Legislative Creation

## APPENDIX 3

### INTERLOCAL COOPERATION AGREEMENT

This Agreement is entered into on the last of the dates set out by the respective signatures hereon pursuant to the authority granted in Article 4413(32c) Tex.Rev. Civ.Stat.Ann. (Vernon, 19____) by and between DENTON COUNTY, DALLAS COUNTY, COLLIN COUNTY AND TARRANT COUNTY, all duly organized and subsisting political subdivisions of the State of Texas, each referred to respectively herein as "DENTON," "DALLAS," "COLLIN" AND "TARRANT";

### WITNESSETH

WHEREAS, in November, 1984, DENTON and DALLAS formed a commission then known as the Bi–County Line Commission for the purposes of determining if sufficient evidence existed for ascertaning on the ground the physical location of the legislatively mandated County Line between Denton County and Dallas County pursuant to the statutory requirements of Article 1582 through 1590, Tex.Rev.Civ. Stat.Ann. (Vernon, 1925); and

WHEREAS, notice was provided of the activities of said Bi–County Commission as well as meetings of said Commission to TARRANT and COLLIN, as well as Wise County, Rockwall County and Parker County during the course of the business of said Commission; and

WHEREAS, TARRANT and COLLIN each separately duly authorized the joinder of their respective Counties through the resolutions of the respective Commissioners Court and the minutes of said Bi–

County Line Commission, subsequently re-named the County Line Commission; and

WHEREAS, all parties uniformly agreed with the formation purposes and goals of the Commission and the general methodology to be used in achieving those goals;

NOW, THEREFORE, be it AGREED by and between all parties hereto as follows:

1. Based upon information obtained through a preliminary contract with Lichli-ter–Jameson and Associates, a consulting firm by and through Don Jackson, a Texas Registered Public Surveyor, (hereinafter referred to as "SURVEYOR"), that the Line which constitutes the Northern Boundary of DALLAS and TARRANT and the Southern Boundary of COLLIN and DENTON which was established by the Legislature of the State of Texas pursuant to its Constitutional Authority sometime prior to 1850 is ascertainable and can be physically located on the ground;

Accordingly, the parties hereby enter into this interlocal cooperation agreement for the purpose of accomplishing the task of on-the-ground ascertainment of that Line.

2. To effectuate the purposes hereof, all parties hereto AGREE that each County will enter into a separate and independent contractual relationship with SURVEYOR which shall be entered into on or about an even date and shall be identical in every respect; SAVE and EXCEPT, that each contract shall address the services that the surveyor shall provide to each respective County and shall provide the agreed compensation to be paid to SURVEYOR by that County which is the subject of prior agreement during the course of meetings of the County Line Commission and which compensation has been de-termined in the aggregate and by each County respectively as follows:

a) The aggregate total compensation to be paid to SURVEYOR pursuant to the total of the four contracts shall be an amount for all services rendered not to exceed One Hundred Forty Thousand and No/100 Dollars ($140,-000.00) together with reimbursement of actual out-of-pocket expenses not exceeding Five Thousand and No/100 Dollars ($5,000.00) and other specified costs as necessary for the erection of monuments and signs; all of which compensation is defined in more detail in each of the respective contracts referenced above.

b. By County, respectively:
 1) Tarrant County — exactly $10,000.00
 2) Dallas County — not to exceed $65,000.00
 3) Collin County — not to exceed $44,000.00
 4) Denton County — not to exceed $21,000.00

It is further AGREED and UNDER-STOOD that the funds provided for the purposes of this Agreement by each of the Counties involved are funds from the general fund of each County and are current revenues. Additionally, the term of this Agreement shall be for one (1) year with any renewal and extension of this Agreement not to exceed one year each and to require written consent of all parties and to be on an annual basis.

3. Further, to effectuate the mutually beneficial purposes of this act in an expedient manner, the parties hereto agree to organize and hereby do organize a project committee which shall be composed of the following members and structured in the following manner:

Members of the Project Committee shall be the Director of Public Works of Dallas County and three other individuals.

DENTON, COLLIN and TARRANT Counties shall each name one (1) of the three members. The representative of each County shall be a person deemed by that County to have a satisfactory level of knowledge and/or expertise in the subject area of surveying and land measurement to satisfy the supervisory needs and concerns of that respective County with respect to the on-going progress of the project. The Project Committee shall function and operate through a chairperson who is designated to be the Director of Public Works of Dallas County which chairperson shall coordinate efforts and maintain the on-going daily contact with SURVEYOR and shall be empowered by the Committee to provide necessary assistance in land access and coordinate the Counties involved to obtain necessary law enforcement presence and other matters attendant to the performance of the task of the SURVEYOR upon request by the SURVEYOR. Further, the Committee shall be empowered to delegate further responsibilities, powers and duties to the Chairperson of said Committee as the Project Committee deems necessary and expedient to the conclusion of the project.

4. It is AGREED and UNDERSTOOD by and between the parties hereto that the SURVEYOR shall direct all communications during the course of this project to the Chairperson of the Project Committee described hereinabove. It is further AGREED and UNDERSTOOD that said Chairperson will either take the necessary action if the authority for same has been delegated by the Project Committee to the Chairperson or shall relay that information to the members of the Project Committee as necessary and appropriate. The scope of communication and information which is contained within the Project Committee's jurisdiction shall include all work progress and any difficulties with same, as well as the transmission of reports of partial completion and/or total completion, and all statements for partial services rendered or final services rendered which shall be communicated first through the Committee Chairperson and then, as appropriate, to the individual members of the Project Committee who shall then take appropriate action with the Commissioners Courts or other appropriate officials of each respective County during the administration of the Contracts. All invoices and statements received from SURVEYOR shall be reviewed by the Project Committee Chairperson and passed on to the respective and appropriate member of the Project Committee for individual handling by the appropriate County and for payment to the surveyor. In addition, progress reports and other correspondence shall also be regularly transmitted by the Project Committee Chairperson to the respective members of the Committee, and the Chairperson shall require progress reports of the SURVEYOR during the course of the Project for this purpose. The surveyor shall be required to report the completion of each phase of the project to the Project Committee which shall examine the work and obtain whatever information is necessary to satisfy itself as to its accuracy. The Project Committee shall specifically review the location of any corner and shall inform the surveyor of any question it has regarding the accuracy of the location. The surveyor shall make every effort to resolve any question prior to final location of any corner. The parties agree that the surveyor is not authorized to file the com-

pleted survey with any county clerk or other public official or entity until the Project Committee has determined by unanimous vote of all four members that the project has been completed; provided however, in the event that the Project Committee cannot agree that the project has been completed, the surveyor may file the results of the survey with any county clerk or other public official or entity if (a) the representative of that county on the project committee certifies in writing that the project is complete, and (b) ten (10) days have passed since the project committee has taken a formal vote in which one or more members has failed to concur that the project is complete.

5. It is AGREED and UNDERSTOOD that the final results and work product of the SURVEYOR, including the maps and ancillary legal descriptions necessary to describe the Line above-referenced, shall become the property of each County which is a party to this agreement, and each County shall have the right to utilize such information independently in any manner it deems expedient to its purposes. Any party hereto shall have full access to any documents, papers, maps or drawings or any other correspondence relative to the project whether that material be held by the Project Committee Chairperson, the SURVEYOR, another party hereto or a third party.

6. It shall be a condition precedent to the entitlement of any party hereto to receive any of the work product above-referenced, or any maps or ancillary legal descriptions, or to make any use of same for any purpose of that County or any County a party hereto that said County shall have paid its full pro rata respective share of the total aggregrate cost of the project. However, nothing herein shall be construed to prevent the examination by any party hereto to the extent necessary to satisfy that party of the quality of the work progress and the technical accuracy and correction of the work progress from examining any and all preliminary maps, drawings or legal descriptions as that party might deem necessary.

7. In the event of default by any party to this agreement with respect to its payments under its individual contract with the SURVEYOR, any or all other parties hereto shall be privileged to assume that obligation either pro rata or in any other agreeable manner and shall be equitably subrogated to the position of the SURVEYOR so paid against the defaulting County, and it is further AGREED by all parties hereto that a provision supporting this equitable subrogation provision shall be included with the individual contracts by and between each County and SURVEYOR.

8. Notwithstanding anything contained herein to the contrary, no party hereto shall be precluded from participating fully in the review and technical approval process during the course of the work on the basis that payments required from or by that party have not previously been made or that the party has not successfully completed its financial obligations.

9. It is AGREED and UNDERSTOOD by and between all parties hereto that with respect to the parties hereto, the notice referenced in Article 1585, Tex.Rev.Civ. Stat.Ann. (Vernon, 19___) has been effectively given to all parties hereto and no further notice is required with respect to said parties. However, upon execution hereof, together with execution of the an-

cillary individual contracts with SURVEYOR and execution of the resolutions supporting this agreement by the respective Commissioners Courts of the parties involved herein; notice in the form of a copy of said resolutions and other documents deemed necessary shall be forwarded to other affected Counties for the purpose of review and inquiry by those Counties as well as for the purposes of allowing said Counties to join in this Agreement as parties if they so desire. For the purposes of this Agreement, affected Counties shall be Jack County, Palo Pinto County, Parker County, Wise County and Rockwall County in addition to the parties hereto.

ATTEST:

BY:_____
County Clerk or Recorder
of Commissioners Court

ATTEST: TARRANT COUNTY, TEXAS

BY: _____
County Clerk or Recorder
of Commissioners Court

BY: _____
Michael Moncrief,
Tarrant County Judge

ATTEST: DALLAS COUNTY, TEXAS

BY: _____
County Clerk of Recorder
of Commissioners Court

BY: _____
David G. Fox,
Dallas County Judge

ATTEST: DENTON COUNTY, TEXAS

BY: /s/ *Marilyn Robinson*

10. This agreement is binding on each of the parties hereto and is to be construed under the laws of the State of Texas. Jurisdiction and venue of any action by and party hereto to enforce any rights hereunder or to have said rights declared shall be determined and controlled by the provisions of Tex.Rules Civ.Proc.Ann., Art. 1591 (Vernon, 1925) regardless of whether the action brought is specifically defined within said statute or is some other cause of action provided said cause of action arises out of this agreement.

This Interlocal Agreement may be executed in multiple originals.

COLLIN COUNTY, TEXAS

BY:_____
William R. Roberts
Collin County Judge

County Clerk of Recorder
of Commissioners Court

BY: /s/ *Buddy Cole*
R.L. "Buddy" Cole,
Denton County Judge

APPROVED AS TO FORM:

BY: _____
Bob Heath, Attorney for
Collin County

BY: _____
Gerald Summerford,
Tarrant County Asst. D.A.

BY: _____
Bowen Weems,
Dallas County Asst. D.A.

BY: _____
Don R. Windle,
Denton County Attorney

## APPENDIX 4

### ISSUE ONE: TRIAL COURT'S FINDINGS OF FACT

3. The George White Line is the only boundary line ever recognized by, and filed of record in, the Texas General Land Office separating Denton and Tarrant Counties.

26. The eastern terminus of the boundary line between Denton and Tarrant Counties is located at the intersection of the George White Line with the west line of Dallas County and the east line of Tarrant County, established by surveyors J.M. Strong and J.J. Goodfellow in 1890, located on the Texas Coordinate System of '917 – North Central Zone, y = 479400.2 feet (northing); × = 2143909.1 feet (easting).

49. The eastern terminus of the boundary line between Denton and Tarrant Counties (where the George White Line crosses the J.M. Strong–J.J. Goodfellow survey of 1890) is marked with a concrete monument which can be found in a pasture located west of Denton Creek, north of SH 121, and east of FM 2499.

57. The George White Line is the only boundary line between Denton and Tarrant Counties that has ever been authorized, surveyed and marked on the ground.

58. The boundary line proposed by Tarrant County in this lawsuit has never been authorized, surveyed or marked on the ground.

59. The boundary line proposed by Tarrant County in this lawsuit would create a wholly new boundary between Denton and Tarrant Counties not previously used by either county for any purpose.

65. The relief requested by Tarrant County in this lawsuit would require the transfer of land previously located within the boundaries of Denton County to Tarrant County.

66. The 1986 interlocal agreement and professional services contracts entered into between Dallas, Denton, Collin and Tarrant Counties and Lichliter–Jameson & Associates, and subsequent survey by Donald Jackson did not affect the boundary separating Denton and Tarrant Counties.

### ISSUE ONE: TRIAL COURT CONCLUSIONS OF LAW

7. The common law principles established in *Jones v. Powers*, 65 Tex. 207 (1885), preclude any movement of the Denton/Tarrant boundary line by a Court of law or by agreement between the counties because it was established under prior law and can be re-ascertained.

11. The 1986 interlocal agreement and professional services contracts entered into between Dallas, Denton, Collin and Tarrant Counties and Lichliter–Jameson & Associates, and subsequent survey by Donald Jackson, did not affect the boundary line separating Tarrant and Denton Counties because the boundary had been established under prior law and was ascertainable at the time of the agreement.

JOHN CAYCE, Chief Justice, concurring on rehearing.

I concur with the majority opinion on rehearing. I write only to clarify the controlling rationale for our dispositive holding that Denton County's suit constitutes

an impermissible collateral attack[1] on the 1986 Interlocal Cooperation Agreement and the subsequent orders issued pursuant to that agreement.

A judgment is void, and therefore subject to collateral attack, only when it is apparent that the court rendering judgment "had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment, or no capacity to act as a court." *Cook v. Cameron,* 733 S.W.2d 137, 140 (Tex.1987) (op. on reh'g) (quoting *Browning v. Placke,* 698 S.W.2d 362, 363 (Tex.1985)). Errors other than lack of jurisdiction render the judgment merely voidable and must be attacked within prescribed time limits for appeal. *Id.*

At the time the 1986 Interlocal Cooperation Agreement was made, and the subsequent orders implementing the agreement were issued, the commissioners courts had jurisdiction of the parties, jurisdiction of the subject matter, and capacity to act as courts. It is axiomatic that counties acting in good faith have the "power" to settle between themselves a bona fide boundary dispute. *Yoakum County v. Gaines County,* 139 Tex. 442, 163 S.W.2d 393, 397 (1942). Therefore, any error committed by the commissioners courts in making and issuing the agreement and orders may have rendered them voidable, but not void ab initio. Consequently, we hold the agreement and orders are not subject to collateral attack.[2]

In one of its arguments for avoiding the binding force of the 1986 Interlocal Cooperation Agreement and subsequent orders, Denton County contends that, if the agreement and orders are construed as establishing a boundary line between the two counties, they violate the provisions of article IX of the Texas Constitution prohibiting existing counties from detaching part of one county and attaching it to another county without a majority vote of the electors of both counties. *See* TEX. CONST. art. IX, § 1(3). There is, however, no evidence in the record of this case that the purpose of the agreement and orders was to detach a part of one county and attach it to another. Because there is no evidence of an article IX violation, the agreement and orders are not subject to collateral attack on the ground that the commissioners courts had no power to do what article IX prohibits.

In sum, it is clear from the record that an express purpose of the 1986 Interlocal Cooperation Agreement and subsequent orders was to locate and identify the southern boundary line of Denton County and the point where it is common with the northeast corner of Tarrant County, and thereby fix the boundary line between the two counties. According to the long-standing decision of the Supreme Court of Texas in *Yoakum,* the commissioners courts of Tarrant and Denton Counties had the power and jurisdiction to do this

1. Denton County's contention that its suit does *not* constitute a collateral attack on the 1986 Interlocal Cooperation Agreement and subsequent orders is, as the majority concludes, incorrect. Denton County's suit attempts to avoid the binding force of the agreement and orders to obtain a judgment redefining the boundary line fixed by the agreement and orders. This constitutes a collateral attack. *See Pellow v. Cade,* 990 S.W.2d 307, 312 (Tex.App.—Texarkana 1999, no pet.).

2. In addition, I believe res judicata applies here to prevent resurrecting and relitigating issues which were definitively settled by the counties when they entered into the 1986 Interlocal Cooperation Agreement and issued the subsequent orders effectuating the agreement. *See Cook,* 733 S.W.2d at 140; *Segrest v. Segrest,* 649 S.W.2d 610, 613 (Tex.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).

under the facts of this case. *Yoakum,* 163 S.W.2d at 397. For these reasons, I agree with the majority that the agreement and orders are not subject to collateral attack on the grounds asserted by Denton County. *See Cook,* 733 S.W.2d at 140.